## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | | |
| | **:** | **CRIMINAL NO: 12-_____** |
| v. | | |
| | | |
| **PATRICIA McGILL** | **:** | **DATE FILED:  _March_    _2012_** |
| **NATALYA SHVETS** | | |
| **GIORGI OQROSHIDZE,** | **:** | **VIOLATIONS** |
| a/k/a "George Oqroshidze" | | **18 U.S.C. § 1349 (conspiracy to** |
| **YEVGENIYA GOLTMAN,** | | **commit health care fraud - 1 count)** |
| a/k/a "Eugenia Goltman" | | **18 U.S.C. § 1347 (health care fraud - 29** |
| **ALEXSANDR KOPTYAKOV,** | | **counts)** |
| a/k/a "Alex Koptyakov" | | **18 U.S.C § 2 (aiding and abetting)** |

## INDICTMENT

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

## INTRODUCTION

At all times material to this indictment:

### The Defendants and Home Care Hospice, Inc.

1.      Home Care Hospice, Inc. ("HCH"), a for-profit hospice provider, was
incorporated in 1999 under the laws of the Commonwealth of Pennsylvania. HCH was
headquartered at 1810 Grant Avenue, Philadelphia, Pennsylvania until approximately April 2006,
at which time HCH relocated to 2801 Grant Avenue in Philadelphia.  HCH was in the business
of providing hospice services for patients at nursing homes, hospitals and private residences.

2.      HCH received Medicare, Medicaid and private insurance reimbursement
for providing home care and in-facility care to purportedly terminally ill patients with life
expectancy prognoses of six months or less. HCH was certified to participate in the Medicare

program on or about June 15, 2000.

        3.    HCH headquarters consisted of office space which served as the hub from which hospice care was managed and coordinated. The Director of HCH, and an owner,  "A.P." (charged elsewhere), handled the daily operations of HCH, which included, among other things, the supervision of clinical care, development and marketing activities, payroll, and claims submission. A.P. supervised a staff, which included the director of nursing, nursing staff supervisors, field personnel nurses and home health aides, an officer manager, accountant, billing clerk, and marketing personnel, among others.

        4.    Defendant PATRICIA McGILL, a registered nurse (RN), was employed at HCH and served as the Director of Nursing and Clinical Services commencing in or about 2005. This title was later changed to "Director of Professional Services"  in or about 2007, but the duties and responsibilities essentially remained the same.  As Director of Professional Services, McGILL was responsible for the planning, implementation and evaluation of hospice services in accordance with local, state and federal regulations. Defendant McGILL also supervised clinical nursing staff, which included reviewing staff documentation and patient charts to assure quality and appropriateness for hospice service and maintaining records of patient visits.  Defendant McGILL assumed responsibility for HCH operation during the absence of hospice Director, "A.P."

        5.    Defendants NATALYA SHVETS and GIORGI OQROSHIDZE, a/k/a "George Oqroshidze" registered nurses ("RNs"), and YEVGENIYA GOLTMAN, a/k/a "Eugenia Goltman" and ALEXSANDR KOPTYAKOV, a/k/a "Alex Koptyakov" licensed practical nurses ("LPNs") were employed at HCH and were supervised by the Director of Professional Services,

defendant PATRICIA MCGILL, among other supervisory staff.  As HCH nurses, defendants

NATALYA SHVETS, GIORGI OQROSHIDZE, YEVGENIYA GOLTMAN and ALEXSANDR

KOPTYAKOV were assigned to provide nursing care for HCH hospice patients in various field

locations by hospice Director A.P., and other supervisors under A.P.'s direction. This nursing

care provided, among other things, developing and implementing a plan of palliative care for the

patient, which included pain management, wound care, monitoring vital signs, administering

medication and other medical equipment for the patient.

### The Medicare Program and Hospice Care

       6.     The Department of Health and Human Services was a department of the

United States government with responsibilities under federal law for the funding, administration

and supervision of certain health care programs, including the Medicare program. Medicare was

a federal health insurance program that provided coverage for individuals 65 years or older and

for certain disabled individuals. Medicare was financed by federal funds from payroll taxes and

premiums paid by beneficiaries. Medicare was a "health care benefit program" as defined in 18

U.S. C. § 24(b).

       7.     The Medicare program consisted of several parts, one of which, relevant to

this indictment, was referred to as "Part A" hospital insurance, which covered inpatient care in

hospitals, nursing homes and skilled nursing facilities. If certain requirements were met, Part A

also covered hospice or home health care. To qualify for hospice care, a Medicare patient must

be certified by a physician as terminally ill with a life expectancy of six months or less if the

terminal condition runs its normal course. At the end of a 90 day enrollment period, a physician

may re-certify a patient for hospice care if the patient remained terminally ill. 42 C.F.R. § 418.21.

8.      Medicare reimbursed for four levels of hospice care. 42 C.F.R.§ 418.302. The following two levels are relevant to this indictment:

(a) <u>Routine Care</u> - Patients received routine care in their own homes or in nursing facilities. Patients were typically cared for by registered nurses (RNs), licensed practical nurses (LPNs), and home health aides. Hospice providers were reimbursed by Medicare at a rate of approximately $140 per day.

(b) <u>Continuous Care</u> - Patients received this level of care at the patient's home, when the patient experienced a medical crisis and required primarily nursing services to alleviate pain and control symptoms. The hospice agency was required to provide a minimum of eight hours of care within each 24 hour period. Hospice providers were reimbursed by Medicare at a rate of approximately $800 per 24 hour period.

9.      When a Medicare patient elected hospice care, the patient was required to waive all curative medical care related to the terminal illness. 42 C.F.R. § 418.24. Thereafter, if a hospice patient entered the hospital and received treatment related to the diagnosis which made the patient eligible for hospice, the hospice agency was required to pay the patient's hospital expenses, unless the patient had revoked his hospice election.  If the patient chose to revoke his hospice service, the agency discharged the patient and the hospice agency was no longer responsible for the cost of the patient's hospitalization. In that circumstance, the cost of the hospitalization was covered by Medicare and not the hospice agency.

10.      HCH, as a hospice provider, submitted claims and received fixed per-diem

4

payments from Medicare. HCH submitted claims to the federal contractor responsible for managing Medicare's claims for various hospice providers in the United States, including Pennsylvania based providers. The claims were submitted by HCH for each day that a patient was enrolled in hospice care and were paid from Medicare based on the level of hospice care claimed to have been provided. Hospice agencies were required to submit accurate and truthful information in order to be reimbursed for services provided to patients.

      11.    From in or about January 2003 through in or about December 2008, Medicare reimbursement to HCH for claims submitted for hospice service constituted approximately 91% of HCH's total reimbursement, resulting in approximately $49 million in payments to HCH.

## THE CONSPIRACY TO DEFRAUD MEDICARE

      12.    From in or about January 2005 through in or about December 2008, in the Eastern District of Pennsylvania and elsewhere, defendants

> **PATRICIA McGILL,**
> **NATALYA SHVETS,**
> **GIORGI OQROSHIDZE,**
>     **a/k/a " George Oqroshidze"**
> **YEVGENIYA GOLTMAN,**
>     **a/k/a "Eugenia Goltman"**
>     and
> **ALEXSANDR KOPTYAKOV,**
>     **a/k/a "Alex Koptyakov"**

conspired and agreed with other persons, including A.P., and others known and unknown to the grand jury, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program, that is Medicare, and to obtain money and property owned by and under the custody and control of Medicare, by means of false and fraudulent pretenses, representations, and

promises, in connection with the delivery of and payment for health care benefits, items and services, by causing to be submitted fraudulent health care insurance claims for hospice services purportedly provided by Home Care Hospice, in that:

(a)  Defendant PATRICIA McGILL, as Director of Professional Services, knowing that certain patients were not eligible for hospice care, authorized the admission and maintenance of inappropriate patients for hospice services, resulting in fraudulent health care insurance claims submitted by HCH in the approximate sum of $ 9,328,000; and authorized HCH nursing staff and home health aides, to falsely document higher, more costly levels of hospice services for patients that were, in reality, not provided to the patients, resulting in fraudulent health care insurance claims submitted by HCH for those patients in the approximate sum of $325,000; and

(b)  Defendants NATALYA SHVETS, GIORGI OQROSHIDZE, as RNs, and YEVGENIYA GOLTMAN and ALEXSANDR KOPTYAKOV, as LPNs, knowing that patients did not receive the level of hospice care claimed by Home Care Hospice to have been provided to patients, falsely documented that those patients received a higher, more costly level of hospice service than actually provided, resulting in fraudulent health care insurance claims submitted by HCH in the approximate sum of $768,700.

## MANNER AND MEANS

It was part of the conspiracy that:

13.    A.P., in order to increase HCH revenues, authorized the submission of claims to Medicare, totaling approximately $14.3 million, between approximately January 2003 and December 2008, which claims defendant A.P. knew were false and fraudulent, in that:

(a)  approximately 30% of the patients on HCH service were ineligible and inappropriate for

hospice care, for which HCH fraudulently obtained payments from Medicare totaling

approximately $12,800,000; and (b) approximately 90% of the continuous care level of hospice

services, billed by HCH at the higher, more costly level of approximately $800 per 24 hour

period were services not provided to the patients, for which HCH fraudulently obtained payments

from Medicare totaling approximately $1,500,000.

### Ineligible Hospice Patients

14.    Hospice Director A.P. and the Director of Professional Services, defendant

PATRICIA McGILL, directed and authorized nursing staff and nursing supervisors to evaluate,

place and maintain ineligible patients, who were not terminally ill, on hospice care. In fact, a

substantial portion of HCH patients were on hospice service for periods in excess of six months,

and in some instances for more than one year.

15.     To facilitate this objective, A.P. and defendant PATRICIA McGILL,

directed and authorized nursing staff and nursing supervisors to fabricate supporting

documentation for patient files to substantiate fraudulent claims HCH submitted to Medicare for

patients inappropriate for hospice care.  This routinely involved the alteration of patient charts

and the falsification of nursing notes to create the appearance "on paper" that the patient's

medical condition was worse than it actually was. This was often accomplished by changing

diagnoses and showing patient decline, such as weight loss, fevers or that the patient suffered

infections, among other things.

16.    From in or about January 2005 through in or about December 2008,

defendant PATRICA McGILL, as Director of Professional Services, assisted A.P. in determining

7

the appropriateness of patients for hospice services, including the admission and retention of

patients who were not appropriate, resulting in the sum of approximately $9,328,000 in

fraudulent claims HCH submitted to Medicare for inappropriate patients admitted and

maintained on hospice service.

**Fraudulent Continuous Care**

17.     Hospice Director A.P. devised and directed a scheme which involved the

fabrication of nursing and home health aide documentation by various HCH staff nurses and

home health aides to support fraudulent claims submitted by HCH to Medicare for the

continuous care level of hospice service that was not provided to patients, but was submitted for

payment by HCH at the higher, more costly rate of approximately $800 per 24 hour period. As a

result, HCH fraudulently received approximately $ 1,500,000 in payments from Medicare

between 2003 and mid 2008.

18.     A.P. and other HCH supervisors at his direction, created phony schedules

"assigning" nurses and home heath aides to falsely document continuous care visits to hospice

patients who did not qualify for continuous care or who were never provided this level of care.

These schedules falsely reflected visits by nurses and home health aides to patients within a 24

hour period, often for two to five day periods of time. In some instances, the phony schedules

were created after patients died or were hospitalized to fraudulently reflect that HCH provided

continuous care service for days prior to the patient's death or hospitalization.

19.     A.P. directed certain members of the HCH nursing staff, nursing

supervisors and home health aides to coordinate the writing of the fabricated nursing notes of

these patient visits by the HCH staff participating in the scheme. This documentation was placed

in the patient files to "support" the false claims submitted to Medicare by HCH. In some instances, individuals who were not trained as home health aides were authorized to document care that was falsely described as continuous care.

20. A.P. paid the nursing staff participating in the continuous care scheme, approximately $20 - $25 for every hour the nurse claimed to have provided the continuous care as reflected in the fabricated nursing notes. Participating home health aides were paid the sum of approximately $11 per hour for every hour falsely claimed to reflect the provision of continuous care.

21. Defendant PATRICIA McGILL, as Director of Professional Services, authorized an individual, who was not a certified home health aide and who was not clinically trained, to document hospice services and patient care that was falsely described as continuous care. This sham home health aide wrote up patient care notes and documentation and was paid by Director A.P. an hourly rate for every hour of fraudluent continuous care services documented. From time to time, defendant McGILL also filled in "gaps" in nursing notes about patient condition and care to document hospice services that were false and fictitious.

22. Defendants NATALYA SHVETS, GIORGI OQROSHIDZE, YEVGENIYA GOLTMAN and ALEXSANDR KOPTYAKOV created false and fraudulent nursing notes and documentation of patient visits and care in connection with a continuous care level of hospice services that was, in reality, not provided to the patients. Defendants SHVETS, OQROSHIDZE, GOLTMAN and KOPTYAKOV were each paid by Director A.P., the approximate sum of $20 per hour of phony continuous care visits documented by them for particular patients according to the fictitious schedules created by A.P. and other HCH supervisors.

23. The false continuous care nursing notes and documentation generated by

defendants NATALYA SHVETS, GIORGI OQROSHIDZE, YEVGENIYA GOLTMAN and

ALEXSANDR KOPTYAKOV, in conjunction with other nursing staff and home health aides

assigned to write phony continuous care, enabled HCH to submit false claims for continuous care

for approximatey 150 different patients and to fraudulently obtain payments from Medicare,

totaling approximately $768,700.

### Obstruction of Medicare Audit

24.     On or about February 23, 2007, HCH was notified by Cahaba Government

Business Administrators (Cahaba), a Medicare federal government contractor which processed

claims submitted for Medicare payment, that HCH was subject to a claims review audit.  This

audit required HCH to produce patient records and supporting documentation for randomly

selected patient charts to substantiate the claims billed.

25.     From in or about March 2007 through in or about April 2007, in order to

conceal from the Medicare contractor that HCH submitted false claims for hospice services,

hospice Director A.P. directed certain members of HCH management, nursing staff, and nursing

supervisors to alter patient charts, falsify nursing notes and forms, and to fabricate supporting

documentation to submit to the Medicare government contractor.  Defendant PATRICIA

McGILL, as Director of Professional Services, assisted A.P. in the patient chart review,

sanctioned false documentation written by the nursing staff, and authorized the alteration of

patient charts in anticipation of the Medicare audit.

### The Medicare Cap

26.     In or about September 10, 2007, HCH was notified by Cahaba that HCH

was required to reimburse Medicare in the approximate sum of $2,625,047 for the overpayment

of claims submitted to Medicare by HCH for the cap year ending 2005.

27.     Commencing in or about October 2007, in order to avoid further Medicare scrutiny, hospice Director A.P. and defendant PATRICIA McGILL, Director of Professional Services, directed staff to review patient files and discharge hospice patients in mass, resulting in the immediate discharge of approximately 79 patients in the month of October 2007.  From in or about October 2007 through January 2008, a total of approximately 128 patients were discharged from HCH, which patients were ineligible for hospice care and had been inappropriately maintained on hospice service in excess of six months.

28.     Commencing in or about the spring of 2008, approximately 20% of the patients discharged during the Medicare cap review, were later readmitted and placed back on hospice service at HCH with the knowledge of defendant PATRICIA McGILL.


All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FOURTEEN
### (HEALTH CARE FRAUD)

THE GRAND JURY FURTHER CHARGES THAT:

   1. Paragraphs 1 through and 11,13 through 16, and 24 through 28 of Count One are re-alleged.

   2. On or about the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendant

### PATRICIA McGILL

knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud a health care benefit program, that is Medicare, and to obtain money and property owned by and under the custody and control of Medicare, by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items and services, and aided and abetted that conduct, by submitting and causing to be submitted fraudulent health care insurance claims for patients in the approximate amounts listed below for hospice services purportedly provided by Home Care Hospice over the dates identified below when defendant McGILL knew the claims were fraudulent, each patient constituting a separate count of this indictment:

| COUNT | PATIENT | CLAIM DATES (First-last) | AMOUNT BILLED (Approx Total) | SERVICE DATES (Approx) | AMOUNT RECEIVED (Approx Total) |
|---|---|---|---|---|---|
| 2 | T.E. | 11/27/06 -11/5/07 | $55,175.74 | 10/17/06-10/26/07 | $55,173.43 |
| 3 | F.G. | 6/16/06 -8/11/08 | $77,504.89 | 5/26/06 -8/25/08 | $73,835.03 |

| COUNT | PATIENT | CLAIM DATES (First-last) | AMOUNT BILLED (Approx Total) | SERVICE DATES (Approx) | AMOUNT RECEIVED (Approx Total) |
|---|---|---|---|---|---|
| 4 | M.Q. | 3/21/06-1/22/07; 5/23/07-11/21/07; 6/19/08; 8/7/08-9/08/08 | $113,546.81 | 12/1/05-1/07/07; 4/26/07-11/4/07; 5/23/08-5/30/08; 7/2/08-8/31/08 | $106,567.73 |
| 5 | B.H. (Fe). | 6/20/05-10/31/07 | $123,047.17 | 5/20/05-7/16/07 | $123,047.97 |
| 6 | B.B. | 5/1/06-10/31/07 | $82,593.53 | 3/31/06-10/23/07 | 82,592.17 |
| 7 | V.S. | 10/12/04- 1/11/06 3/13/07- 10/22/07 | $99,424.23 | 9/16/04-12/31/05; 2/23/07-10/20/07 | $99,423.29 |
| 8 | M.M. (M) | 3/20/07-5/22/07 | $6,002.81 | 3/16/07-4/25/07 | $6,002.79 |
| 9 | J.G. | 3/19/07-6/5/07 | $5,856.40 | 3/16/07-04/24/07 | $5,856.38 |
| 10 | R.R. | 3/19/07-5/21/07 | $5,270.76 | 3/16/07-4/20/07 | $5,270.74 |
| 11 | B.H. (M) | 3/19/07-12/26/07 | $31,701.84 | 3/16/07-10/16/07 | $31,554.02 |
| 12 | R.K. | 10/11/06- 10/04/07 | $54,695.51 | 9/22/06-9/30/07 | $54,695.30 |
| 13 | C.B. | 4/2/07-5/16/07 | $3,806.66 | 3/16/07- 4/10/07 | $3,806.64 |

13

| COUNT | PATIENT | CLAIM DATES (First-last) | AMOUNT BILLED (Approx Total) | SERVICE DATES (Approx) | AMOUNT RECEIVED (Approx Total) |
|---|---|---|---|---|---|
| 14 | J.H. | 1/4/07-10/17/07 | $44,456.23 | 12/15/06-10/10/07 | $44,454.24 |

In violation of Title 18, United States Code, Section 1347 and Section 2.

## COUNTS FIFTEEN THROUGH THIRTY ONE
### (HEALTH CARE FRAUD)

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.      Paragraphs 1 through 11, and 13 through 23 of Count One are re-alleged.

       2.      On or about the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendants

**NATALYA SHVETS,**
**GIORGI OQROSHIDZE,**
      **a/k/a " George Oqroshidze"**
**YEVGENIYA GOLTMAN,**
      **a/k/a "Eugenia Goltman"**
      and
**ALEXSANDR KOPTYAKOV,**
      **a/k/a "Alex Koptyakov"**

knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud a

health care benefit program, that is Medicare, and to obtain money and property owned by and

under the custody and control of Medicare, by means of false and fraudulent pretenses,

representations, and promises, in connection with the delivery of and payment for health care

benefits, items and services, and aided and abetted that conduct, by causing to be submitted

fraudulent health care insurance claims for patients in the approximate amounts listed below for

the continuous care level of  hospice services purportedly provided by Home Care Hospice over

the dates identified below when defendants NATALYA SHVETS, GIORGI OQROSHIDZE,

YEVGENIYA GOLTMAN and ALEXSANDR KOPTYAKOV, knew the claims were

fraudulent, each patient constituting a separate count of this indictment:

| COUNT | PATIENT | CLAIM DATES (First-last) | AMOUNT BILLED (Approx Total) | SERVICE DATES (Approx) | AMOUNT RECEIVED (Approx Total) | DEFENDANT |
|---|---|---|---|---|---|---|
| 15 | A.R. | 5/7/07 | $2910.30 | 4/13/07-4/16/07 | $2910.71 | GOLTMAN |
| 16 | M.M. (Fe) | 5/23/07 | $3595.60 | 5/08/07- 5/12/07 | $3596.10 | GOLTMAN |
| 17 | D.G. | 8/11/08 | $2,793.76 | 7/21/08 - 7/24/08 | $2,793.73 | OQROSHIDZE KOPTYAKOV |
| 18 | R.F. | 6/17/08 | $1,764.48 | 6/9/08 - 6/11/08 | $1,764.46 | SHVETS |
| 19 | F.P. | 4/9/07 | $3,560.00 | 3/24/07- 3/28/07 | $3,560.49 | SHVETS OQROSHIDZE |
| 20 | T.P. | 8/07/08 | $588.16 | 7/18/08 - 7/19/08 | $588.15 | SHVETS |
| 21 | E.F. | 6/5/07 | $3,595.60 | 5/11/07 - 5/15/07 | $3,596.10 | SHVETS OQROSHIDZE KOPTYAKOV |
| 22 | E.M. | 8/30/07 | $1,744.40 | 8/1/07 - 8/3/07 | $1,744.64 | OQROSHIDZE KOPTYAKOV |
| 23 | W.W | 7/6/07 | $3,061.60 | 6/17/07- 6/21/07 | $3,062.03 | SHVETS |
| 24 | L.S.  (M) | 5/20/08 | $2,646.72 | 5/12/08- 5/15/08 | $2,646.69 | GOLTMAN |
| 25 | N.N. | 6/19/08 | $1,470.40 | 5/31/08- 6/01/08 | $1,470.38 | KOPTYAKOV |
| 26 | L.S. (Fe) | 7/6/07 | $1,121.40 | 6/15/07 - 6/16/07 | $1,121.56 | OQROSHIDZE |
| 27 | E.L. | 4/23/07 | $3,577.80 | 3/31//07- 4/4/07 | $3,578.30 | SHVETS, OQROSHIDZE KOPTYAKOV |
| 28 | R.Z. | 7/6/07 | $1,744.40 | 6/9/07 - 6/11/07 | $1,744.64 | SHVETS |

| COUNT | PATIENT | CLAIM DATES (First-last) | AMOUNT BILLED (Approx Total) | SERVICE DATES (Approx) | AMOUNT RECEIVED (Approx Total) | DEFENDANT |
|---|---|---|---|---|---|---|
| 29 | M.M. (M) | 3/22/07 | $1,495.20 | 3/6/07 - 3/7/07 | $1,495.41 | KOPTYAKOV |
| 30 | N.L. | 8/13/08- 2/17/09 | $3,602.48 | 6/23/08 - 6/27/08 | $3,602.44 | KOPTYAKOV |

In violation of Title 18, United States Code, Section 1347 and Section 2.

**A TRUE BILL:**

_____

**FOREPERSON**

_____
**ZANE DAVID MEMEGER**
**United States Attorney**