## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :

    v.      :   CRIM. NO.  12-00112-01

PATRICIA McGILL     :

### THE GOVERNMENT'S RESPONSE TO DEFENDANT'S
### RENEWED MOTION FOR JUDGMENT OF ACQUITTAL
### AND MOTION FOR A NEW TRIAL

The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, Frank Labor III, Assistant United States Attorney, and Marty Woelfle, Trial Attorney, Organized Crime & Gang Section, responds to defendant Patricia McGill's renewed motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and motion for a new trial pursuant to Rule 33. As set forth more fully below, the jury's guilty verdicts on Count Three, Four, Nine, and Fourteen are supported by substantial evidence and the defendant has not shown that the government's proof was in any way deficient. Nor has the defendant identified any trial errors that would warrant a new trial. Accordingly, the Court should deny the defendant's motions.

### I.  PROCEDURAL HISTORY

On March 21, 2012, a grand jury sitting in the Eastern District of Pennsylvania returned a 30-count indictment charging McGill with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 1), and thirteen substantive counts of health care fraud, in violation of 18 U.S.C. § 1347. The four co-defendants in this case entered guilty pleas or were convicted at a separate trial. McGill was the only remaining defendant from the Superseding Indictment to go to trial in January 2016.

Prior to trial, the government filed three motions *in limine*:

(1) a motion requesting submission of a copy of the redacted indictment to the jury during deliberation (ECF No. 251); the defendant filed a response (ECF No. 355); the Court granted the motion (ECF No. 411);

(2) a motion to admit recordings of intercepted conversations (ECF No. 306); the defendant filed a response (ECF No.  354); the Court granted the motion on stipulation (ECF No. 391); and

(3) a motion to admit exhibits as business records (ECF No. 307); the defendant filed a response (ECF No. 353); the Court granted the motion subject to conditions (ECF No. 391).

The defendant filed eight pretrial motions:

(1) a motion for a James hearing and for a coconspirator statement order of proof (ECF No. 356); the government filed a response (ECF No. 374); the Court denied the motion (ECF No. 384);

(2) a motion to bar inflammatory language (ECF No. 357); the government filed a response (ECF No. 373); the Court denied the motion as premature (ECF No. 384);

(3) a motion for a bill of particulars and the identification of false documents (ECF No. 358); the government filed a response (ECF No. 377); the Court denied the motion (ECF No. 384);

(4) a motion to compel identification of alleged Brady and Giglio evidence (ECF No. 359); the government filed a response (ECF No. 379); the Court denied the motion (ECF No. 384);

(5) a motion to bar the admission of peer comparison evidence (ECF No. 361); the government filed a response (ECF No. 375); the Court denied the motion (ECF No. 384);

(6) a motion to dismiss on the ground of the statute of limitations (ECF No. 367); the government filed a response (ECF No. 376); the Court denied the motion (ECF No. 384); (7) a motion to compel disclosure of discovery (ECF No. 369); the government filed a response (ECF No. 382); the Court denied the motion as moot (ECF No. 369); and (8) a motion to dismiss Counts Two through Fourteen of the Superseding Indictment on Constitutional grounds that the underlying statute was void for vagueness (ECF No. 380); the government filed a response (ECF No. 383); the Court denied the motion (ECF No. 391).

Prior to trial, the defendant also filed a notice of defenses (ECF No. 360) and an amended notice of defenses (ECF No. 378), asserting the defenses of entrapment by estoppel and a public authority defense. The government filed a response, requesting the Court to exclude the defenses (ECF No. 381), to which the defendant replied (ECF No. 386). The Court granted the government's motion to exclude as to the public authority defense, but denied the government's motion as to entrapment by estoppel (ECF No. 391). However, at trial, the defendant did not request that this Court charge the jury on a defense of entrapment by estoppel.

Pretrial, the defendant also engaged in lengthy motion practice concerning her claim that she was incompetent to stand trial.  On August 19, 2015, the Court issued Findings of Fact and Conclusions of Law finding the defendant competent to stand trial (ECF No. 318 – under seal). Trial began on January 7, 2016. After the close of the government's case, the defendant moved for a judgment of acquittal on all charges, which motion the Court took under advisement. On February 12, 2016, after approximately three and half days of deliberations, the jury convicted the defendant of four counts of health care fraud. The jury found the defendant not guilty of the conspiracy charge and nine additional counts of health care fraud. On February 17, 2016, the

defendant filed a renewed motion pursuant to Rule 29 and a motion for new trial under Rule 33 (ECF No. 428).

In her motion for judgment of acquittal, the defendant asserts that:

(a) the government failed to present sufficient proof that Medicare was a health care benefit program affecting commerce, see Motion at 7;

(b) the testimony of government witness Alex Pugman negated the government's proof that McGill intended to defraud Medicare, see Motion at 8;

(c) the four counts of conviction are void for vagueness because the government did not prove that McGill had the specific intent to violate 18 U.S.C. § 1347 and the underlying Medicare regulations alleged in the indictment, see Motion at 12;

(d) the government failed to prove that McGill submitted any bills to Medicare or assisted anyone else in submitting bills to Medicare, see Motion at 12-13;

(e) the statute of limitations bars the counts of conviction, see Motion at 13-14; and

(f) the convictions on Counts Four and Nine are deficient because a cooperating witness falsified the patient files for hospice patient M.Q. and patient J.G., and these acts by a government agent cannot be used to convict the defendant. See Motion at 14.

## II.    APPLICABLE LEGAL STANDARDS

A. <u>Motion for Judgment of Acquittal under Rule 29</u>

Federal Rule of Criminal Procedure 29 provides that:

> (a) After the government closes its evidence … the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.
>
> (b) The court may reserve decision on the motion… and  decide the motion after [the jury] returns a verdict…. If the court reserves

decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

The Third Circuit has described the standard for ruling on a motion for judgment of acquittal under Rule 29 as follows:

> A defendant "challenging the sufficiency of the evidence" pursuant to Rule 29 "bears a heavy burden." In reviewing a verdict for sufficiency of evidence, we "consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt."

United States v. John-Baptiste, 747 F.3d 186, 201 (3d Cir. 2014) (internal citations omitted).

The Court must consider the totality of the evidence and the fact that some evidence may point to a conclusion other than guilt does not mean the jury's guilty verdict is defective:

> In conducting the sufficiency inquiry, we do not view the government's evidence in isolation, but rather, in conjunction and as a whole. "The court must determine 'whether all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt.'" … "[T]he evidence need not be inconsistent with every conclusion save that of guilt."

United States v. Brodie, 403 F.3d 123, 134 (3d Cir. 2005); see also United States v. Smith, 294 F.3d 473, 476-77 (3d Cir. 2002).

Rule 29 does not permit the Court to "usurp the role of the jury by weighing the evidence or assessing the credibility of witnesses." United States v. Canalichio, 952, F. Supp. 2d 763, 765 (E.D. Pa. 2013) (quoting, Brodie, 403 F.3d at 133).

B. Motion for New Trial under Rule 33

Rule 33(a) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interests of justice so requires." Fed. R. Crim. P. 33(a).

Rule 33 is addressed primarily to newly discovered evidence, but allows the trial court to vacate a jury verdict in situations where "errors, 'combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" Huggins v. United States, 69 F. Supp. 3d 430, 453 (D. Del. 2014) (internal citations omitted).

"[A] district court may, in its discretion, 'order a new trial only if it finds that there is serious danger that a miscarriage of justice has occurred - that is, that an innocent person has been convicted.'" Canalichio, 952 F. Supp. 2d at 766. While the scope of review under Rule 33 is broader than Rule 29, id., the grounds for granting relief are still quite limited:

> In exercising its discretion, the court may grant a motion for a new trial on one of two grounds. First, the court may grant the motion if, after weighing the evidence, it determines that there has been a miscarriage of justice. Second, the court must grant a new trial if trial error had a substantial influence on the verdict.

United States v. Bianchi, 594 F.Supp.2d 532, 538 (E.D. Pa. 2009) (citing United States v. Henry, 2007 WL 2458555 at *2 (E.D. Pa. 2007)).

Harmless errors that do not deprive the defendant of a fair trial are not a basis for granting a motion under Rule 33. See Canalichio, 952 F. Supp. 2d at 766.

### III.     SUMMARY OF THE TRIAL EVIDENCE

At trial, the government presented 15 witnesses, who introduced 62 exhibits. The documentary evidence consisted of business records, including excerpts of patient files seized from Home Care Hospice ("HCH"), and records from Medicare and its contractors. The government introduced 26 recordings of intercepted conversations of the defendant and other participants, and one consensual videotaped and audiotaped recording. The witnesses called by the government included Alex Pugman, the former Director of HCH, several nurses and office workers who were employed by HCH and who participated in the fraud scheme, and several

former HCH employees who left the company and reported what they believed to be fraudulent activities to the Department of Health and Human Services Office of Inspector General ("HHS/OIG"). The government also presented testimony of Jean Stone, a Medicare expert, and the investigative agents who participated in the joint FBI and HHS/OIG investigation of HCH.

The evidence presented at trial proved that Pugman and others conducted a massive scheme to defraud Medicare by submitting fraudulent claims for reimbursement for HCH patients who did not meet the Medicare requirements for hospice care, and fraudulent claims for "continuous care" a more intensive level of hospice care for which Medicare paid more, that was not in fact provided to HCH patients. The trial evidence demonstrated that the defendant was a knowing participant in the scheme to defraud, and was aware that HCH records, including patient files, were being systematically falsified and submitted to Medicare contractors to support HCH's claims for  reimbursement. The evidence showed that the defendant participated in the falsification of records; she was aware that HCH routinely enrolled patients who were not hospice-eligible; and she kept those patients on service for extended periods of time.

A summary of the trial testimony and exhibits is set forth in the Appendix submitted in support of the government's response to the defendant's motions.

     **IV.**    **ARGUMENT**

          **A.**    **The Government Presented Substantial Evidence that Medicare is a Health Care Benefit Program Affecting Commerce.**

The defendant was convicted of four counts of health care fraud, in violation of Title 18, U.S.C. §1347 and 2. This Court instructed the jury that to convict the defendant of health care fraud, the government was required to prove the following elements beyond a reasonable doubt:

> (1) the defendant devised or willfully participated in a scheme to defraud Medicare of money or property by materially false or

fraudulent pretenses, representations or promises, Court's Instructions, ¶ 86;

(2) the defendant acted with intent to defraud Medicare, Court's Final Jury Instructions, ¶ 87; and

(3) Medicare was a health care benefit program. Court's Final Jury Instructions, ¶ 88.

A "health care benefit program" is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24. Thus, the government was required to prove that Medicare was public or private plan or contract "affecting commerce." As to this element, the Court instructed the jury as follows:

Affecting interstate commerce means any action, which in any way, interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce between or among states. The effect can be minimal.

Court's Final Jury Instructions, ¶ 100.

While it appears that the Third Circuit has not directly addressed what quantum of evidence necessary to prove that a health care benefit program affects commerce under § 1347, it has spoken generally to the issue: "Given the complex state of modern health care delivery, it is difficult to envision any public or private health care plan or contract that does not affect commerce." United States v. Whited, 311 F.3d 259, 268 (3d Cir. 2002).

In addressing the federal jurisdiction element of 18 U.S.C. §1347, the Eleventh Circuit has referred to case law developed under the Hobbs Act, 18 U.S.C. §1951, which contains similar "affects commerce" language:

The words "affecting commerce," as the Supreme Court has repeatedly explained, are "words of art that ordinarily signal the

> broadest permissible exercise of Congress' Commerce Clause
> power." … The government needs only to establish a minimal
> effect on interstate commerce to support a violation.

Annotations and Comments, Eleventh Circuit Pattern Jury Instructions, January 2015 (internal citations omitted).

In addressing the amount of evidence necessary to prove that conduct affected commerce for a Hobbs Act violation, the Third Circuit has stated that "[t]he government needs only to establish a minimal effect on interstate commerce to support a violation." See United States v. Powell, 693 F.3d 398, 406 (3d Cir. 2012) (holding that the government must prove "an actual or potential *de minimis* effect on interstate commerce for conviction."). The Third Circuit has ruled that proof of an actual effect on interstate commerce is not necessary to confer federal jurisdiction in Hobbs Act prosecutions. See United States v. Urban, 404 F.3d 754, 761 (3d Cir. 2005) (collecting cases). In Urban, the Court upheld a jury instruction providing that "[y]ou do not even have to find that there was an actual effect on commerce. All that is necessary to prove this element is that the natural consequences of the extortion - of the money payment, potentially cause an effect on interstate commerce to any degree, however minimal or slight." Id.; see also United States v. Powell, 693 F.3d 398, 402 (3d Cir. 2012).

The Third Circuit has noted, in a case dealing with the jurisdictional affecting commerce element under 18 U.S.C. §844(i), that the *de minimus* standard cannot be not satisfied by trivial or attenuated contacts with commerce. See United States v. McGuire, 178 F.3d 203, 210 (3d Cir. 1999). In McGuire, the Third Circuit overturned the defendant's conviction for aiding and abetting the use of an explosive device to destroy property used in an activity affecting interstate commerce. The defendant confessed to placing a pipe bomb underneath the seat of the victim's car. The trial evidence established that the car was occasionally used in a catering business, and contained a bottle of orange juice that traveled in interstate commerce at the time of the

explosion. In reversing the conviction, the Third Circuit held this evidence was insufficient to satisfy the affecting commerce standard. The Third Circuit acknowledged the broad sweep of Congress' Commerce Clause authority and the minimal connection necessary to establish federal jurisdiction, but found "there are uses so trivial or attenuated that they are not covered by the statute." McGuire, 178 F.3d at 210 (internal citation omitted). The Third Circuit stated:

> Proof that this single bottle of orange juice was to have been used by a business that is as concededly local in character as [the victim's company] is simply not sufficient to establish jurisdiction under §844(i).

Id., 178 F.3d at 212. The Third Circuit acknowledged its ruling did not provide significant guidance regarding precisely what evidence *is* necessary to prove a commerce nexus, but expressed confidence "that trial courts will be able to continue making practical, common sense determinations of whether the evidence in a given case is sufficient to justify the exercise of federal jurisdiction." Id.

In her motion, the defendant argues that "[t]he health care fraud counts fail because no government witness testified about any interstate commerce effect." Motion, at 7. This argument borders on the frivolous. Contrary to the defendant's claim, the government is not required to call a witness to explicitly testify that Medicare affected commerce. Rather, the jury may infer the impact on interstate commerce from the evidence. See Urban, 404 F.3d 754, 765 (3d Cir. 2005) (jury may infer interstate commerce affected from showing that business assets were depleted).

In any event, the government introduced substantial evidence regarding Medicare's effect on commerce. The first witness called by the government was Medicare expert Jean Stone. Ms. Stone prepared a PowerPoint presentation to accompany her testimony. Government Exhibit ("GEX") 15. Ms. Stone testified that Medicare is a federal health insurance program with

millions of beneficiaries, which annually pays out billions of dollars in reimbursements in regions across the country. Appendix, ¶ 12. Ms. Stone and Alex Pugman testified that HCH submitted biweekly claims to Medicare's fiscal intermediary, Cahaba Government Benefit Administrators ("Cahaba GBA"). Appendix, ¶ 4. During the time period covered by the Indictment, Cahaba GBA was located in Des Moines, Iowa. Id. For example, GEX 12 contains copies of correspondence between HCH and CMS. Included in GEX 12 is a letter dated September 10, 2007 from CMS to Pugman, as Director of HCH. GEX 12, at 3. This letter informed HCH of the Medicare cost cap problem described by a number of witnesses. The letter instructed HCH to refund an overpayment of funds to HCH, and directed that HCH send the payment to the Cahaba GBA Post Office Box in Des Moines, Iowa.

Pugman testified that he submitted HCH claims to Medicare electronically, and that HCH was reimbursed by Medicare through electronic fund transfers to HCH's bank account. Appendix, ¶ 4. Pugman also identified Federal Express Air Bills that were used by HCH to send patient files to Cahaba in Iowa, in response to a request medical records review by Cahaba. GEX 26-4, at 67. These records show that HCH, whose office was located in Philadelphia, Pennsylvania, sent patient files to Medicare on April 20, 2007, which were received by Medicare in Des Moines, Iowa, on April 23, 2007.

Ms. Stone testified that the hospice care provider must pay for all of its costs for providing patient care out of the per-diem Medicare reimbursement. Appendix, ¶ 10. S/A Matthew Hirschy testified, both on direct and cross-examination, that the Medicare did not reimburse HCH separately for its costs of supplies and equipment provided to hospice patients, but rather, HCH had to purchase its supplies and equipment from the funds that Medicare sent to HCH through the electronic payment system. Appendix, ¶ 130. S/A Hirschy testified that

Medicare sent approximately $44,000,000 in electronic fund transfers to HCH during the indictment period. Appendix, ¶ 131. Clearly, the electronic transfer of millions of dollars of funds from Medicare to HCH, which HCH had to use to operate its business, had an effect on commerce.

In sum, the government's evidence was more than sufficient to prove that Medicare met the definition of a "health care benefit program" because its operations had the requisite *de minimis* or potential effect on commerce.

> B.    Pugman's Testimony Did Not Negate the Substantial Evidence of Defendant's Intent to Defraud Medicare.

The defense asserts that Pugman's testimony established that the defendant "was *not* part of the conspiracy and that the government was well aware of that because of Title III tapes in Russian which confirmed that the conspirators kept her out of it for fear she would report them." Motion at 7. The defendant provides no authority for the proposition that the testimony of one trial witness is conclusive as to the sufficiency of the government's proof of the defendant's fraudulent intent. Defendant's contention is contrary to the well-established standard applicable to a motion for a judgment of acquittal under Rule 29: the Court must consider all of the trial evidence and draw all reasonable inferences from that evidence in favor of the government. As the Third Circuit noted in <u>Brodie</u>, the government's evidence does not have to eliminate every possible conclusion except guilt. Pugman's testimony on cross-examination in which he attempted to minimize McGill's role in the fraudulent scheme is only one piece of the universe of evidence which the jury had to consider.

More importantly, defendant's assertion that Pugman exonerated the defendant misstates Pugman's trial testimony. On cross-examination, Pugman agreed with defense counsel that McGill was a "straight shooter," although he did not define that term. Appendix, ¶ 33. Pugman

further testified that he tried to distance McGill from the continuous care fraud. Id. Pugman

volunteered that he had heard in one of the government's intercepted conversations, a statement

by an unidentified HCH investor that McGill would object to the plan to discharge hospice

patients in response to the Medicare cost cap.[1] On redirect, Pugman was asked if a nurse who

was a "straight shooter" would pre-sign blank death certificates. Rather than answer the question

directly, Pugman responded that he was "aware of that." Pugman then acknowledged that McGill

knew what was going on with respect to the scheme to defraud Medicare. Id. Pugman explained

that he felt McGill was less involved in the fraud scheme than Pugman and the other participants.

Id. Pugman also admitted that McGill participated in the falsification of patient records. Id. Thus,

Pugman's testimony actually supported the jury's finding that the defendant was a knowing

participant in the scheme to defraud.

In addition to Pugman's testimony, the government introduced substantial evidence

showing the defendant's intent to defraud Medicare. This evidence included:

- McGill knew that patients on the HCH hospice service did not meet the Medicare

requirements for hospice care. Appendix, ¶¶ 33, 49-53, 122, 127;

- McGill knew that billing Medicare for inappropriate patients was fraud. Appendix, ¶ 51;

- McGill knew that after the Medicare cost cap problem was resolved, HCC re-enrolled

many of the inappropriate hospice patients who McGill and Pugman had previously discharged

in response to the Medicare cost cap problem. Appendix, ¶ 126-27;

---

[1] Defendant did not introduce this recording at trial. The government introduced substantial evidence that, rather than objecting to the discharge of hospice patients, McGill directed HCH nurses to discharge hospice patients in response to the Medicare cost cap problem.  Appendix, ¶¶ 25,  48-51, 92.

- McGill recognized that a patient being discharged from the Roxborough Hospital was not appropriate for hospice care, but agreed with Pugman that HCH could bill Medicare for a couple of days of hospice care for this patient to get some money. Appendix, ¶ 28;

- McGill instructed Barber to falsify a Medicare document by back-dating the revocation form for patient E.H. Appendix, ¶ 54;

- McGill, along with Wiley, Hearn and Pugman, directed nurse Colleen Keating to fabricate a Medicare record by preparing an initial assessment for continuous care for hospice patient J.C., a week after J.C. had died. Appendix, ¶ 138;

- Nurse Christine Parker informed McGill that Luda Novikov had asked her to falsify a patient record, which Parker refused to do. When Ms. Parker later informed McGill that the falsified record was in the patient file, McGill removed the document from the file. Nevertheless, the false record was put back in the patient file and included in the medical records submitted by HCH to Cahaba in response to the medical records audit. Appendix, ¶¶ 101-102;

- McGill's signature appeared on the false training certifications for Timothy Wiley. Appendix, ¶ 78;

- McGill instructed nurse Ed Hearn to falsify continuous care notes. Appendix, ¶ 87;

- McGill scheduled nurse Cathy Gonzales to provide continuous care for patient E.M., when the patient's family wanted a respite, even though E.M. did not need continuous care. Appendix, ¶ 37;

- McGill instructed nurse Gonzales to "split" the patient file for E.M., to create the false appearance that this hospice patient had revoked hospice care before going to the hospital for treatment, when E.M. had not done so, Appendix, ¶ 38;

- McGill was aware Pugman and Roytenberg were falsifying patient records in response to the Medicare medical records audit in April 2007. Appendix, ¶ 113;

- McGill instructed Barber to "beef up the charts," meaning to "doctor up" the patient files for HCH hospice patients R.K. and A.D., because the medical records did not support these patients being on hospice service. Appendix, ¶ 53.

With respect to the four counts of conviction, the government presented substantial evidence showing that McGill possessed the requisite intent to defraud Medicare in connection with these specific patients.

The jury's conviction on Count Three pertained to hospice patient F.G. This patient was on HCH hospice service for five separate periods between May 2006 and October 2008. Appendix, ¶ 133.  F.G. did not die until 2011. GEX 16. Not surprisingly, Nurse Roytenberg testified that F.G. did not qualify for hospice care. Appendix, ¶ 107. F.G. was one of the patients discharged by McGill and Pugman in October 2007 in response to the Medicare cost cap issue. Id.; GEX 16. After the Medicare cost cap problem was resolved, F.G. was placed back on hospice care. GEX 16. Thus, F.G. was one of the patients to whom McGill was referring when she told nurse Chudnosky that 20% of the inappropriate patients discharged in response to the Medicare cost cap problem were put back on HCH hospice service. Appendix, ¶¶ 126-27. McGill confirmed her knowledge that this was fraudulent when she warmed Chudnovsky: "If Medicare comes in and brings the feds in with them, he'll lose this company." Appendix, ¶ 127. McGill presided over the IDT care plan meetings for F.G. in 2006 and 2008. Appendix, ¶ 107. The length of time that F.G. was on hospice care, the "cycling" of F.G. on and off hospice care, the date of her death, and her re-enrollment on hospice care after the Medicare cost cap

discharge, all confirm that McGill knew F.G. was not appropriate for Medicare hospice care, even though HCH was submitting claims for her hospice care.

The jury's conviction on Count Four pertained to hospice patient M.Q. The evidence established that McGill knew that M.Q. was not appropriate for hospice care and that HCH should not have submitted claims for her hospice care to Medicare. Barber testified M.Q. was not appropriate for hospice care. Appendix, ¶ 57. M.G. was cycled on and off HCH hospice care multiple times during the period December 2005 through August 2008.  Appendix, ¶ 57, 134, GEX 16. McGill presided over IDT care plan meetings for M.Q. from November 2005 through September 2008. Appendix, ¶ 57. M.Q. did not pass away until January 2014. GEX 16. McGill directed Barber to discharge M.Q. from hospice service in October 2007 because HCH was only providing custodial care. Appendix, ¶ 50. Similar to F.G., M.Q. was discharged in the fall of 2007 in response to the Medicare cost cap, but re-enrolled in the spring of 2008. GEX 16. M.Q.'s patient file contained false continuous care notes prepared by T.J. Wiley. Appendix, ¶ 58.

The jury's conviction on Count Nine pertained to hospice patient J.G., a patient cared for by nurse Christine Parker. Ms. Parker testified she did not believe J.G. was appropriate for hospice care, and that she told McGill J.G was not hospice appropriate. Appendix, ¶ 100. Nurse Barber also testified that J.G. was not appropriate for hospice care. Appendix, ¶ 63. J.G. was cycled on and off hospice care, and McGill presided over IDT care meetings for J.G. from 2005 through 2007. Appendix, ¶¶ 63, 135. J.G. passed away in March 2008. Appendix, ¶ 135. In April 2007, Ms. Parker reported to McGill that Novikov had asked her to falsify a medical record in J.G.'s patient file. Appendix, ¶¶ 101-102. Later, Ms. Parker reported to McGill that the falsified medical record had in fact been placed in J.G.'s patient file. Although McGill removed the false medical record from J.G.' patient file in the presence of Ms. Parker, the falsified medical record

was contained in the patient file sent by HCH to Cahaba in response to the medical record audit. Id. Based upon the foregoing evidence, the jury could rationally find that McGill knowingly participated in a scheme to defraud Medicare with respect to patient J.G.

Finally, the jury's conviction on Count Fourteen pertained to hospice patient J.H., a patient cared for by nurse Ed Hearn. Nurse Hearn testified that J.H. was not appropriate for hospice care. Appendix, ¶ 92. Pugman also acknowledged in an intercepted conversation that Barber was not appropriate for hospice care. Appendix, ¶ 31. In the same conversation, Cecelia Wiley stated that she could "fix" J.H.'s patient file. The patient file for J.H contained false continuous care notes. Appendix, ¶ 72. J.H. was on HCH hospice service from December 2006, until his discharge in October 2007 in response to the Medicare cost cap problem. Appendix, ¶ 92, 136. McGill presided over IDT care plan meetings during the period January 2007 through September 2007. Appendix, ¶ 92. J.H died in 2011. Appendix, ¶ 136. On the basis of this evidence, the jury could rationally find that McGill participated in the scheme to defraud Medicare with respect to J.H. because this patient was not eligible for Medicare coverage.

The defense notes that "[n]o witness testified that Mrs. McGill intended to defraud anyone" Motion, at 8. However, as the Court instructed the jury, circumstantial evidence is sufficient to prove guilty knowledge. See United States v. Klein, 515 F.2d 751, 754 (3d Cir. 1975). Indeed, circumstantial evidence is frequently the only evidence available regarding a defendant's state of mind. In sum, there was more than sufficient evidence for the jury to find that the defendant was aware that HCH was submitting claims to Medicare for hospice patients who did not qualify for hospice care, that HCH hospice patient records were being falsified, and that those falsified records were used to support fraudulent claims for reimbursement from Medicare for inappropriate patients, with respect to patients F.G, M.Q., J.G. and J.H.

17

C.    The Federal Health Care Fraud Statute Is Not Void
for Vagueness and Does Not Require Proof of
Specific Intent to Violate the Health care Fraud Law.

In her motion for acquittal, the defendant restates the argument she made in a pre-trial motion, which the Court has previously rejected, that the health care fraud statute is Constitutionally void for vagueness because the Medicare regulations described in the Superseding Indictment do not provide adequate notice of what conduct is considered criminal. The defendant filed a pretrial motion to dismiss Counts Two through Fourteen of the Indictment on the ground that 18 U.S.C. § 1347 is void for vagueness, as applied in this case. See Pretrial Motion (ECF No. 380), at 2. The United States filed a response, which is incorporated by reference in this response. The Court denied the defendant's motion on January 11, 2016 (ECF No. 391). Defendant's post-trial motion adds nothing new to her claim that § 1347 is void for vagueness. The defendant continues to assert, erroneously, that she was charged with criminal violations of the Medicare regulations. In fact, the indictment charged the defendant with participating in a scheme to defraud Medicare, in violation of § 1347. Contrary to the defendant's contention, the jury did not convict her for "violating a strict six-month limit" on hospice care. Motion, at 9.  Accordingly, the Court's decision denying this claim is dispositive of defendant's post-trial motion.

The defendant also renews her contention, raised during the Rule 30 charge conference, that a 2010 amendment of 18 U.S.C. § 1347 eliminated the need for the government to prove that a defendant had specific intent to violate the health care fraud laws. See Motion, at 11-12. Defendant now asserts her convictions violate the *ex post facto* clause of the Constitution because the 2010 amendment lowered the government's burden of proof after the commission of her conduct which allegedly violated § 1347. See Motion, at 11-12. This contention is meritless

because the Court has previously rejected this precise argument and the Third Circuit has affirmed the Court's decision. See United States v. Shvets, 2015 WL 7352184 (3d Cir. Nov. 20, 2015).

At her separate trial, co-defendant Natalya Shvets requested that this Court instruct the jury that the "knowing and willfully" element of § 1347 required the government to prove that the defendant had the specific intent to violate the health care fraud law. The Court denied this request. On appeal, Shvets asserted that "§ 1347 requires 'proving defendant's knowledge of the statutes alleged to make her conduct criminal….'" Id., at 1.  The Third Circuit upheld the Court's ruling that the 2010 modification of § 1347 did not change the *mens rea* of the statute.  Thus, the Third Circuit has squarely rejected the defendant's claim that the 2010 amendment modified the intent element of § 1347 by eliminating the requirement to prove the defendant had the specific intent to violate the health care fraud law:

> The proper definition of "willfully" under § 1347 hinges primarily on the nature of a 2010 amendment to the statute, which states that '[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of his section.' 18 U.S.C. § 1347(b). The pre-2010 version of § 1347, under which Shvets was charged, does not contain this provision and is silent as to the definition of willfulness under the statute. Therefore, the question is whether the 2010 amendment represents a substantive change in the statute's *mens rea* requirement, or whether it was merely clarifying in nature.
>
> As conceded by Shvets' trial counsel, the legislative history of the 2010 amendment forecloses Shvets' current argument that § 1347 requires proof of the defendant's knowledge of the statute…. ("The bill … addresses confusion [and] … clarifies that 'willful conduct' in this context does not require proof that the defendant had actual knowledge of the law in question or specific intent to violate that law.") And the weight of the case law interpreting § 1347 … only strengthens this conclusion.

Id. at *4 (internal citations omitted).

19

The defendant does not cite, let alone attempt to distinguish <u>Shvets</u>. Defendant's failure to address this case is not surprising: <u>Shvets</u> is dispositive of her argument.

> D.    The Government Did Not Have to Prove that
>        the Defendant Participated in the Billing Process.

The defendant argues that she cannot be found guilty of health care fraud because "[t]here was no proof at trial that she submitted any bills, or assisted in their submission." Motion, at 12. This argument is based on a misapprehension of the health care fraud statute, as well as the charges in the Superseding Indictment.

Counts Two through Fourteen charged McGill with executing, and attempting to execute, a scheme to defraud Medicare and to obtain money from Medicare by means of false pretenses, representations and promises, in the delivery of and payment for health care benefits. <u>See</u> Superseding Indictment, Counts 2-14, ¶ 2, at 12. Counts Two through Fourteen also charged McGill with aiding and abetting others in the execution of the fraudulent scheme. <u>Id</u>. Counts Two through Fourteen alleged that McGill carried out the scheme "by submitting and causing to be submitted fraudulent health care insurance claims" for HCH patients. <u>Id</u>. The Superseding Indictment further described the manner and means of how the participants carried out the fraudulent scheme. <u>Id</u>., Count One, at 6-8, 10-11.[2]

Contrary to the defendant's argument, the Superseding Indictment did not allege that the defendant personally participated in the submission of any bills. Indeed, the Superseding Indictment did not have to charge McGill with submitting bills because the act of submitting claims is not an element of health care fraud. It is not even necessary that participants in the fraudulent scheme actually make a claim: the statue prohibits attempts to defraud as well. Thus,

---

[2] Counts Two through Fourteen re-alleged paragraphs 1 through 11, 13 through 16, and 24 through 28 of Count One. <u>See</u> Superseding Indictment, Counts 2-14, ¶ 1, at 12.

defendant's assertion that the government's proof was deficient because it did not satisfy the element of billing Medicare is unfounded.

What the Superseding Indictment did charge, and what the government's evidence did prove, was that McGill participated in the execution of a fraudulent scheme, and aided and abetted other participants in the execution of that scheme, through the submission of fraudulent claims to Medicare for insurance reimbursement for patients who did not qualify for Medicare coverage. The evidence clearly established that McGill knew HCH was billing Medicare for the hospice care allegedly provided to HCH patients. On May 3, 2007, McGill presided over a staff meeting during which she explained to the HCH nurses and HHA the Medicare claims review audit. Appendix, ¶ 47. During this meeting, McGill emphasized the importance of making sure that the patient documentation adequately represented that the HCH patients appeared to meet Medicare criteria. On October 18, 2007, McGill presided over a staff meeting during which she and Pugman explained to the HCH nurses and HHAs the problem with the Medicare cost cap. Appendix, ¶ 50. This evidence clearly supports the jury's findings supporting the counts of conviction that McGill knew HCH was submitting claims to Medicare to obtain reimbursement for hospice care allegedly provided to HCH patients.

The government's evidence also established that the claims submitted for the HCH patients underlying the counts of conviction were fraudulent, because the patients did not meet Medicare criteria for hospice care, and that McGill knew these claims were fraudulent. During the October 18, 2007 meeting, McGill told the HCH staff that submitting claims to Medicare for patients who were inappropriate constituted health care fraud:

> The have to meet criteria.... Here's the deal, it's fraud if you are
> keeping them on and they don't need to be on, it's fraud....

Appendix, ¶ 51, GEX 17, at 7.

21

As described above, the government's evidence established that the four HCH patients identified by their initials in the counts of conviction were not appropriate for Medicare hospice reimbursement. The evidence also established that McGill knew that these patients were not appropriate. In some instances, McGill's statements reflect her knowledge that the patients did not meet Medicare criteria for hospice care. Appendix, ¶ 50. In addition, the length of time the patients were on hospice service, as well as the fact that the patients were being "cycled" on and off hospice care, all of which McGill knew because she presided over IDT care plan meeting for these patients, confirmed these patients were not hospice appropriate. With respect to Counts Three and Four, the evidence showed that McGill knew these inappropriate patients were re-enrolled on HCH hospice care following the Medicare cost cap discharge. Finally, the evidence established that McGill participated in the process of submitting these fraudulent claims to Medicare, and assisted Pugman and other HCH employees in the submission of fraudulent claims, by supervising the nursing and HHA staff, making sure that their patient charts contained the documentation needed to support the Medicare claims, and presiding over the IDT care plan meetings so that the HCH could continue to carry these four patients on hospice service and continue to submit claims to Medicare for these patients.

The case cited by the defendant, United States v. Kline, 922 F.2d 610 (10th Cir. 1990), is inapposite, as the statute in Kline, 18 U.S.C. § 287, requires presentation of a claim as an element of the offense. There is no such requirement in 18 U.S.C. § 1347.

The defendant also misconstrues the application of the aiding and abetting statute in this case. The defendant was charged with aiding and abetting the execution of the scheme to defraud. The government presented ample evidence to support the jury's finding that Pugman and others carried out a scheme to defraud Medicare by submitting fraudulent claims for

inappropriate patients and for continuous care that was not provided. The evidence also
established McGill aided and abetted Pugman and the other participants in the execution of the
scheme to defraud by maintaining inappropriate patients on HCH hospice service.

The Court correctly instructed the jury regarding aiding and abetting as well as the
elements of health care fraud. The jury could rationally find that the defendant was guilty of
health care fraud under either theory. See Rosemond v. United States, __ U.S. __, 134 S. Ct.
1240 (2014).

> E.    The Four Counts of Conviction Were Brought
>        Within Five Year Limitations Period.

The defendant filed a pretrial motion to dismiss the charges in the Superseding
Indictment based on an alleged violation of the statute of limitations (ECF No. 367). The United
States filed a response (ECF No. 376, incorporated by reference as part of this response). The
Court denied the defendant's motion in a Memorandum Opinion issued on January 5, 2016 (ECF
No. 384).

The defendant does not provide any additional factual or legal support for her argument
in her motion for acquittal. The government's evidence clearly establish that each of the four
counts of conviction fell within the five year limitations period because HCH submitted
fraudulent claims to Medicare for these four patients during the five year period preceding the
return of the original indictment. Appendix, ¶¶ 133-37. Accordingly, the Court' prior ruling
denying the defendant's statute of limitations defense applies with equal weight to defendant's
post-trial motion for a judgment of acquittal.[3]

---

[3] The defendant contends that "any evidence including activities and billing, prior to March 21
2007, for the counts of conviction must be stricken…." Motion, at 14. The defendant provides no
authority for the novel proposition that the statute of limitations is an exclusionary rule of
evidence. Contrary to defendant's unsupported assertion, the statute of limitations is *not* an

F.    There Is No Evidence That The Government
      Directed a Cooperating Witness to Falsify
      Medical Records for HCH Hospice Patients.

The defendant asserts a judgment of acquittal must be granted on Count Four because Richard Barber, an HCH nurse who assisted the FBI and the HHS/OIG during the investigation of HCH, "'doctored up' the [M.Q.] file during and while in the employ of the FBI as an agent/informant." Motion, at 14. The defendant contends she cannot be lawfully convicted on the basis of misconduct committed by a government agent acting pursuant instructions from the government.

The defendant cites no evidentiary support for her assertion that the government directed Barber to "doctor up" M.Q.'s patient file. To the contrary, the government evidence established that Barber falsified HCH patient records in response to instructions from HCH employees, not the investigative agents. Appendix, ¶¶ 43, 46. Barber did testify, quite extensively, regarding the falsification of patient records. However, Barber testified that he made false entries in patient files on the orders of McGill, Pugman, and other HCH employees who were themselves acting on the orders of Pugman. Indeed, it was McGill who directed Barber to "beef up the chart" for two other HCH hospice patients. Appendix, ¶ 53. Barber testified that he was not acting on FBI instructions when he made false entries in HCH records. There was no evidence to the contrary adduced at trial. In short, the defendant's argument that she was convicted on the basis of misconduct orchestrated by the government, has no basis in fact.[4]

---

exclusionary rule: if the government establishes that some part of the fraud scheme occurred within the limitations period, then all of the evidence relating to the scheme is admissible.

[4] The defendant also suggests the conviction on Count Nine is defective because HCH patient J.G. was "a Barber patient at one time…." Motion, at 14. This assertion is frivolous: no evidence suggests that Barber falsified J.G.'s patient chart and the defendant does not even allege that Barber did so.

## V.        THERE IS NO BASIS FOR A NEW TRIAL UNDER RULE 33

The defendant requests the Court grant her a new trial "in the interests of justice" under Rule 33. The defendant states that "[t]he cumulative errors by the government so infected the jury's deliberations that they influenced the verdict and a new trial should be granted."  Motion, at 15. Significantly, the defendant does not identify what specific trial errors the government allegedly committed. Nor does defendant identify any newly discovered evidence that would entitle her to a new trial. Assuming that the "cumulative errors" claimed by the defendant are the same as those alleged in her Rule 29 motion, the defendant has failed to meet her burden under Rule 33 to establish "a serious danger that a miscarriage of justice has occurred - that is, that an innocent person had been convicted." Canalichio, 952 F. Supp. 2d at 766 (quotations and citations omitted).

## VI.    CONCLUSION

Based on all of the foregoing, the United States respectfully requests that this Court deny the defendant's motion for a judgment of acquittal pursuant to Rule 29, and her motion for a new trial under Rule 33, of the Federal  Rules of Criminal Procedure.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

/s/ Marty Woelfle
Trial Attorney
Organized Crime & Gang Section

FRANK A. LABOR III
Assistant United States Attorney

25

## **CERTIFICATE OF SERVICE**

Frank A. Labor III, an Assistant United States Attorney, certifies that a copy of the

Government's Response to the Defendant's Renewed Motion for a Judgment of Acquittal and Motion

for a New Trial was served on defense counsel Lynanne B. Wescott by ECF on March 25, 2016.

/s/ Frank A. Labor III
Assistant United States Attorney