IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA  :

v.  :  CRIM. NO. 12-112-01

PATRICIA McGILL  :

**UNITED STATES' RESPONSE
TO DEFENDANT'S SUPPLEMENTAL BRIEF
IN SUPPORT OF DEFENDANT'S MOTION
FOR A JUDGMENT OF ACQUITTAL**

The United States of America respectfully submits this response to the defendant's supplemental submission in support of her motion for a judgment of acquittal.

A. Proof that Medicare is a Health Care Benefit Program

In her motion for acquittal, McGill argued that the government's proof of the health care fraud violations was insufficient because the trial evidence did not establish that Medicare was a health care benefit program as defined by 18 U.S.C. § 24(b):

> [T]he government did not prove that Medicare was a health care benefit program affecting commerce as defined in the statute because there was no adequate testimony about commerce.

Motion, at 7.

In its response, the government catalogued the trial evidence supporting the jury's finding that Medicare was a health care benefit program within the meaning of § 24(b). First, Jean Stone, the government's Medicare expert, testified that Medicare is a federal health care benefit program which has millions of beneficiaries and processes billions of dollars of health insurance claims every year. Response, at 10-11. Ms. Stone testified that the Medicare health insurance program is administered by the Centers for Medicare and Medicaid Services ("CMS"). See Appendix of Evidence, ¶ 1. Ms. Stone testified that Cahaba Government Benefit

Administrators ("Cahaba GBA") served as Medicare's fiscal intermediary. See Appendix of Evidence, ¶ 2. This evidence supported the inference that Medicare affects commerce by processing and paying a large volume of health care insurance claims on a national scale. Second, the testimony of Ms. Stone, Alex Pugman, and HSI Special Agent Matthew Hirschy, established Medicare processed more than $40 million in health care insurance claims submitted to Medicare by Home Care Hospice ("HCH") for patients who allegedly received hospice care. Response, at 11-12; GEX 13. The government introduced records showing that Cahaba GBA was located in Iowa while HCH was located in Pennsylvania. Response, at 11; GEX 9, 11, 12. Ms. Stone and Pugman testified these claims and payments were processed though Medicare's electronic fund system. Appendix, § 4; GEX 57.[1] Third, the testimony of Ms. Stone and Special Agent Hirschy established the funds HCH received from Medicare would cover HCH's costs for providing health care services to its patients. Response, at 11-12; see also GEX 12, p. 71-72.[2]

---

[1] GEX 57 contains documentation relating to HCH's enrollment in Medicare's electronic data interchange system with Cahaba GBA.

[2] GEX 12 contains a letter from CMS/Cahaba GBA, from its office in Iowa, to HCH in Philadelphia, Pennsylvania, dated November 7, 2007, and related documents. The correspondence informed HCH that Medicare had recalculated the hospice cap based upon revised information from HCH and that no amount was due to "the Program." GEX 12 contained copies of the information HCH provided to CMS/Cahaba GBA, including an HCH income statement for the nine month period ending September 30, 2007. GEX 12, p. 71-72. (A copy of the income statement is submitted as Exhibit A.) The statement reflects that HCH had revenues of $10,483,412, of which $9,586,520 were Medicare deposits. The statement reflects HCH spent $9,965.453 on operating expenses, including salaries, medical supplies, rent, professional fees, and office expenses.

At the hearing, the government noted the trial evidence also supported a finding of an effect on interstate commerce under the depletion of assets theory, see United States v. Urban, 404 F.3d 754, 761 (3d Cir. 2005), based upon the recording admitted into evidence during which McGill explained to her nursing staff that keeping inappropriate patients on hospice care would result in the patients not having Medicare benefits available when they actually needed hospice care. See GEX A18, at 4.

2

At the hearing on defendant's motion, McGill raised a new argument: she now claims that the government's proof was deficient because Cahaba GBA was not a health care benefit program. In her supplement response, McGill contends that CMS does not fit the statutory definition of a health care benefit program because CMS "does not provide medical benefits, items or services to individuals." Supplemental Response, at 1-2. McGill has also submitted new exhibits, not introduced at trial. According to the defendant, these documents show that Medicare did not affect interstate commerce because Medicare had millions of beneficiaries in Pennsylvania who received payments. Supplemental Response at 1.

Defendant's new assertion that CMS and Cahaba GBA do not satisfy the statutory definition of § 24(b) is deeply flawed. Preliminarily, defendant's argument misstates the relevant legal standard. The question is not whether CMS or Cahaba GBA is a health care benefit program. The pertinent issue is whether the government's evidence is sufficient to establish that Medicare is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual...." 18 U.S.C. § 24(b). The fact that Medicare administered the federal health care insurance program through a government agency, and processed and paid claims through its sub-contractor, does not vitiate Medicare's impact on interstate commerce: CMS and Cahaba GBA operated as Medicare's agents and their activities constituted commercial activity by Medicare. As the Third Circuit has noted:

> Medicare, as is well known, is a federal health benefits program providing financial assistance to senior and disabled citizens to cover medical costs. *Fischer v. United States,* 529 U.S. 667, 671, 120 S. Ct. 1780, 146 L.Ed.2d 707 (2000). "Medicare attains its objectives through an elaborate funding structure," *id.* at 673, 120 S. Ct. 1780, one aspect of which involves reimbursement to health care providers for medical treatment costs incurred in furnishing services to Medicare recipients, *id.* at 677, 680, 120 S. Ct. 1780.

> Providers are reimbursed by the Centers for Medicare and Medicaid Services ("CMS") through a "fiscal intermediary," which is a private entity that contracts with CMS to help it administer the Medicare program by determining payment amounts and making payments. 42 U.S.C. §§ 1395h(a), 1395kk–1(a); 42 C.F.R. § 405.902; *see also Fischer,* 529 U.S. at 677, 120 S. Ct. 1780.

United States v. Kolodesh, 787 F.3d 224, 229-30 (3d Cir. 2015).

More importantly, the courts have uniformly rejected defendant's argument that entities such as Medicare and its subcontractors cannot satisfy the statutory definition of § 24(b) because they only provide health insurance benefits or related services and do not provide health care to individuals. See United States v. Manamela, 612 Fed. App'x. 151, 155-56 (3d Cir. 2015) (not precedential) (social service agency tasked with assuring and coordinating the delivery of health care services to at-risk children, was a health care benefit program for purpose of 18 U.S.C. § 1347); United States v. Collins, 774 F.3d 256, 260 (5th Cir. 2014) (automobile insurers who pay for medical treatment constitute health care benefit programs under § 1347); United States v. Gelin, 712 F.3d 612, 617 (1st Cir. 2013) (same); United States v. Lucien, 347 F.3d 45, 52 (2d Cir. 2003) (same). Here, the trial evidence showed that Medicare, operating through a federal agency, CMS, and its subcontractor, Cahaba GBA, provided health insurance benefits for individuals receiving health care services. This evidence amply supports the jury's finding that Medicare is a health care benefit program under § 24(b).

The new exhibits submitted by the defendant are not part of the trial evidence, and therefore the Court may not consider them in addressing the sufficiency of the government's proof. In any event, the defendant's new exhibits actually support the sufficiency of the government's proof. The data submitted by McGill reflect that during 2007, Pennsylvania had 383,507 dual enrollees in Medicare and Medicaid, while nationally there were "about 9 million" dual enrollees. See Medicare-Medicaid Enrollee Profile, Pennsylvania, at 1. Thus, a significant

4

portion of dual enrollees, more than 8.6 million beneficiaries, were located outside of Pennsylvania. According to the data, the 9 million dual enrollees represented 20% of the national Medicare population. Id. Therefore, the total Medicare population for 2007 was 45 million beneficiaries (9,000,000 divided by 20%). If Pennsylvania had 2.3 million Medicare beneficiaries, id., then 42.7 million Medicare beneficiaries were located outside of Pennsylvania. Thus, defendant's data confirms that Ms. Stone's testimony that Medicare is federal program with millions of beneficiaries supports the jury's rational inference that Medicare affects interstate commerce, because its beneficiaries and its payments to those beneficiaries were dispersed throughout the nation. The defendant's data does not support the adverse inference, which the defendant seeks to draw from Ms. Stone's testimony, that Medicare only processed claims for the 2.3 million Medicare beneficiaries located in Pennsylvania. Such an inference is both contrary to the jury's guilty verdicts and irrational.

In sum, the government's trial evidence established that Medicare, acting though CMS and Cahaba GBA, had a substantial impact on interstate commerce. This evidence is more than sufficient to sustain the jury's guilty verdicts.[3]

---

[3] Arguably, § 24(b) does not require a showing of an effect on interstate commerce. The statutory language of § 24(b) does not contain the term "interstate" and therefore, any effect on commerce may be sufficient to satisfy the statute. The Hobbs Act, which contains analogous "affects commerce" language, defines "commerce" as both interstate commerce and "all other commerce over which the United States has jurisdiction." 18 U.S.C § 1951(b)(3). The United States has jurisdiction over the federal Medicare program and its commercial activities. Thus, proof that Medicare was the victim of fraud under § 1347 may be sufficient to satisfy the "affecting commerce" clause of § 24(b). See, e.g., United States v. McGovern, 329 F.3d 247, 248 (1st Cir. 2003) (Medicare is a health care benefit program as defined under § 24(b)). However, the Court does not have to decide this issue because the government requested the Court to instruct the jury that § 24(b) required proof of an effect on interstate commerce, and the government's evidence satisfied that standard.

B. <u>Defendant's Ex Post Facto Claim</u>

In support of her claim that the Court's jury instruction on the elements of § 1347 violated the ex post facto clause of the Constitution because the 2010 amendment to § 1347 lessened the requisite *mens rea* to prove a violation of the statute, the defendant cites <u>United States v. Houser</u>, 2011 WL 2118847 (N.D. Ga. 2011). Contrary to defendant's assertion, <u>Houser</u> does not assist her argument.

In <u>Houser</u>, the district court adopted the report and recommendation of a magistrate judge denying the defendants' motion to dismiss a count charging conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349. In the report, the magistrate court quoted the post-2010 amendment version of § 1347, even though the defendants' offense conduct occurred before Congress adopted the 2010 amendment. The defendants asserted that the magistrate's report violated the ex post facto clause because the report relied upon the later version of the statute. The district court rejected that claim, finding that the reference in the report to the post-2010 amendment version of § 1347 was a clerical error. Therefore, defendant's "arguments about the amended statute are consequently inapplicable." <u>Id</u>., slip op. at 5.

At best, <u>Houser</u> represents a case where the defense raised the ex post facto argument which the defendant asserts in this case. The district court in <u>Houser</u> did not decide that issue, let alone rule that defendant's ex post facto argument was correct. Here, the Court has rejected the assertion that the 2010 amendment to § 1347 changed the *mens rea* requirement of the statute in the case of McGill's co-defendant, Natalya Shvets, and the Third Circuit has affirmed that ruling. See <u>United States v. Shvets</u>, 2015 WL 7352184 (3d Cir. 2015). In upholding the Court's ruling, the Third Circuit noted that the weight of authority from other

6

Courts of Appeals supported its conclusion that the 2010 amendment did not change the *mens rea* requirement of § 1347. Accordingly, the Court's jury instruction in this case did not violate the ex post facto clause because it did not change or lessen the government's burden of proof under § 1347. See <u>Hopt v. Territory of Utah</u>, 110 U.S. 574, 589 (1884); <u>Weaver v. Graham</u>, 450 U.S. 24, 29 n. 12 (1981).

C. <u>Conclusion</u>

For all of the reasons stated above and in its previous filings, the United States respectfully submits that the defendant's motion for a judgment of acquittal should be denied.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

/s/ Frank A. Labor III
FRANK A. LABOR III
Assistant United States Attorney

MARTY WOELFLE
Trial Attorney
Organized Crime & Gang Section



2801 Grant Avenue, Philadelphia, PA 19114
Phone: (215) 552-9980 • Fax: (215) 552-9981

Medicare/Medicaid Certified Hospice ■ JCAHO Accredited ■ Consultation Services

October 5, 2007

Ms. Cindy Bosley
Senior Reimbursement Analyst
Provider Audit & Reimbursement
Cahaba GBA
400 E. Court Avenue
Des Moines, IA 50309

RECEIVED
OCT 0 8 2007
PROVIDER AUDIT &
REIMBURSEMENT

Re: Extended Repayment Plan Request
    Home Care Hospice
    Provider Number 39-1635

Dear Cindy:

In accordance with the Intermediary's letter dated September 10, 2007, we are requesting an extended repayment plan (ERP) to repay the calculated overpayment related to the 10/31/05 Computation of Hospice Inpatient Limitation and Reimbursement Cap. The proposed repayment schedule is October 2007 to September 2012. As we have previously discussed, we anticipate a major change to the calculated overpayment upon your review of the revised beneficiary listing which we sent last week. The following is the support for the repayment plan:

1. <u>Amortization Schedule</u> – Please find at **Exhibit 1** the completed amortization schedule for the requested sixty-month period.

2. <u>First Installment Payment</u> - The first payment was sent via FedEx on October 2, 2007 under separate cover. We have verbally verified the receipt of this payment with the Overpayment Collection Department.

3. <u>Balance Sheets</u> - please find at **Exhibit 2** the current balance sheet (9/30/07). A copy of the last completed cost reporting period's balance sheet (12/31/06) was sent under separate cover on October 4th with the installment check.

4. <u>Income Statements</u> - Please find at **Exhibit 3** the current income statement (9/30/07). A copy of the last completed cost reporting period's balance sheet (12/31/06) was sent under separate cover on October 4th with the installment check.

5. <u>Statement of Sources and Appli</u>[...] ase find at **Exhibit 4** the Statement of Sources and Application of Fu[...]

GOVERNMENT EXHIBIT A

6. <u>Cash flow statements</u>- Enclosed at **Exhibit 5** is the cash flow statement for period of January 1, 2007 through September 30, 2007.

7. <u>Projected cash flow statement</u>- Please find at **Exhibit 6** the projected cash flow statement for the remainder of this fiscal year and in addition FY 2008.

8. <u>List of restricted cash funds</u>- This item is not applicable

9. <u>List of investments</u>- This item is not applicable

10. <u>List of notes and mortgages payable</u>- This item is not applicable

11. <u>Schedule showing amounts due to and from related organizations</u>- Please find at **Exhibit 7** the schedule showing the names of related organizations appearing on the balance sheet as "Due From" in the current asset section of the 9/30/07 Balance Sheet.

12. <u>Schedule showing types and amounts of expenses paid to related organizations</u>- Please find at **Exhibit 8** the schedule showing related organizations on the 9/30/07 income statement.

13. <u>Loan applications</u>- Please find at **Exhibit 9** a copy of a loan application along with a bank denial letter.

14. <u>Percentage of Occupancy</u>- This item in not applicable to the type of service that Home Care Hospice provides.

A check for the first payment of the Extended Repayment Plan has been sent under separate cover for your receipt. We expect that we will already be removed from 100% withholdings by the receipt of this letter but we respectfully request that we remain off withholdings until the cap calculation is recalculated.

We thank you in advance for your cooperation. If you have any questions or need additional information please feel free to call us at (215) 552-9980.

Sincerely,

*[signature]*

Alex Pugman,
Hospice Director

**HOME CARE HOSPICE, INC**
**INCOME STATEMENT**
**FOR THE NINE MONTHS ENDING SEPTEMBER 30, 2007**
<u>**EXHIBIT 3**</u>

|  | Current Month |  | Year to Date |  |
|---|---:|---:|---:|---:|
| **REVENUES** | | | | |
| AETNA DEPOSIT | 5,301.00 | 0.59 | 15,219.00 | 0.15 |
| AMERICHOICE DEPOSITS | 0.00 | 0.00 | 38,236.00 | 0.36 |
| HEALTH PARTNERS DEPOSITS | 21,550.20 | 2.38 | 133,064.33 | 1.27 |
| INDEPENDENCE BLUE CROSS DEP. | 17,097.00 | 1.89 | 37,582.00 | 0.36 |
| KEYSTONE MERCEY DEPOSITS | 4,566.42 | 0.50 | 62,448.53 | 0.60 |
| MEDICARE DEPOSITS | 716,875.22 | 79.22 | 9,586,520.28 | 91.44 |
| NAT'L ASSOC BENEFIT PLAN | 0.00 | 0.00 | 1,250.00 | 0.01 |
| BENEVOLENT CARE (DR) | (295.43) | (0.03) | (2,061.61) | (0.02) |
| DONATIONS (CR) | 325.00 | 0.04 | 1,395.00 | 0.01 |
| MEDICAID DEPOSITS | 138,456.66 | 15.30 | 599,376.99 | 5.72 |
| SWEEP DIVIDENT CREDIT | 1,043.91 | 0.12 | 10,381.63 | 0.10 |
| TOTAL REVENUES | 904,919.98 | 100.00 | 10,483,412.15 | 100.00 |
| **COST OF SALES** | | | | |
| TOTAL COST OF SALES | 0.00 | 0.00 | 0.00 | 0.00 |
| GROSS PROFIT | 904,919.98 | 100.00 | 10,483,412.15 | 100.00 |
| **EXPENSES** | | | | |
| ADVERTISING EXPENSE | 2,699.96 | 0.30 | 16,981.69 | 0.16 |
| AUTO EXPENSES | 18,720.33 | 2.07 | 155,894.39 | 1.49 |
| BANK CHARGES | 217.31 | 0.02 | 2,184.58 | 0.02 |
| CHARITABLE CONTRIB/DONATIONS | 5,000.00 | 0.55 | 70,850.00 | 0.68 |
| CONFERENCE EXPENSE | (98.10) | (0.01) | 21,050.44 | 0.20 |
| CONSULTING FEES | 0.00 | 0.00 | 21,808.00 | 0.21 |
| CONTRACTOR'S FEES | 57,481.38 | 6.35 | 384,539.40 | 3.67 |
| CRIMINAL RECORDS | 0.00 | 0.00 | 1,070.00 | 0.01 |
| DUES AND SUBSCRIPTIONS EXP | 81.91 | 0.01 | 5,571.86 | 0.05 |
| EDUCATION & TRAINING EXP | 8,113.14 | 0.90 | 82,987.95 | 0.79 |
| EMPLOYEE BENEFIT PROGRAMS EXI | 361.58 | 0.04 | 1,311.58 | 0.01 |
| INSURANCE - AUTO | 0.00 | 0.00 | 6,961.00 | 0.07 |
| INSURANCE - MEDICAL/DENTAL | 36,010.84 | 3.98 | 358,108.55 | 3.42 |
| INSURANCE-GENERAL | 0.00 | 0.00 | 6,034.00 | 0.06 |
| INSURANCE - S/T& L/T | 2,309.91 | 0.26 | 21,177.47 | 0.20 |
| INSURANCE-PROFESSIONAL | 0.00 | 0.00 | 5,955.00 | 0.06 |
| INSURANCE - W/C | 0.00 | 0.00 | 169,387.00 | 1.62 |
| INSURANCE - OFFICERS LIFE | 0.00 | 0.00 | 1,470.00 | 0.01 |
| INSURANCE - 401K | 0.00 | 0.00 | 270.00 | 0.00 |
| INTEREST EXP - PIDC LOAN 250K | 0.00 | 0.00 | 3,271.06 | 0.03 |
| INTEREST EXPENSE | 5,523.54 | 0.61 | 10,459.24 | 0.10 |
| JANITORIAL EXP | 5,930.00 | 0.66 | 57,465.00 | 0.55 |
| LABORATORY FEES | 4,282.36 | 0.47 | 16,798.38 | 0.16 |
| LEASE AUTO - LEXUS (MY) | 703.58 | 0.08 | 6,332.22 | 0.06 |
| LEASE AUTO - LEXUS(LG) | 707.08 | 0.08 | 6,363.72 | 0.06 |
| LEASE AUTO - MERCEDES | 782.63 | 0.09 | 7,043.67 | 0.07 |
| LEASE - POSTAGE SYSTEM | 78.86 | 0.01 | 78.86 | 0.00 |
| LEGAL AND PROFESSIONAL EXPENS | 3,948.25 | 0.44 | 57,045.36 | 0.54 |
| LICENSES/REGISTRATIONS EXPENSI | 0.00 | 0.00 | 250.00 | 0.00 |
| MEALS EXP | 159.51 | 0.02 | 1,427.29 | 0.01 |
| MEDICAL SUPPLIES | 40,146.66 | 4.44 | 330,227.31 | 3.15 |

# HOME CARE HOSPICE, INC
## INCOME STATEMENT
### FOR THE NINE MONTHS ENDING SEPTEMBER 30, 2007
#### EXHIBIT 3

| | | | | |
|---|---:|---:|---:|---:|
| MEDICAL SUPPLIES-PHARMACY | 29,248.68 | 3.23 | 248,211.47 | 2.37 |
| MEDICAL TRANSPORT | 1,085.00 | 0.12 | 6,480.00 | 0.06 |
| MEMBERSHIP FEES | 0.00 | 0.00 | 940.00 | 0.01 |
| OFFICE EXPENSE | 876.90 | 0.10 | 5,797.76 | 0.06 |
| OFFICE SUPPLIES EXP | 1,653.52 | 0.18 | 33,392.55 | 0.32 |
| PAYROLL TAX - MEDICARE (CO.) | 9,943.55 | 1.10 | 96,750.01 | 0.92 |
| PAYROLL TAX - SOCIAL SEC (CO.) | 16,415.28 | 1.81 | 234,553.80 | 2.24 |
| PAYROLL TAX - FUTA-FED (CO.) | 0.00 | 0.00 | 8,021.96 | 0.08 |
| PAYROLL TAX-SUTA(PAUC) - (CO.) | 0.00 | 0.00 | 39,958.19 | 0.38 |
| BPT TAX | 0.00 | 0.00 | (31,416.00) | (0.30) |
| POSTAGE EXPENSE | 239.81 | 0.03 | 3,484.73 | 0.03 |
| PRINTING EXP | 3,424.00 | 0.38 | 14,526.67 | 0.14 |
| PROFESSIONAL FEES | 28,881.21 | 3.19 | 242,803.12 | 2.32 |
| PROMOTIONAL EXP | 0.00 | 0.00 | 4,528.25 | 0.04 |
| RENT OR LEASE EXPENSE | 42,000.00 | 4.64 | 378,000.00 | 3.61 |
| RENT - (HOSPICE ROOM & BOARD) | 4,500.00 | 0.50 | 90,857.90 | 0.87 |
| REPAIRS & MAINT. | 827.87 | 0.09 | 17,578.65 | 0.17 |
| SECURITY EXP | 84.00 | 0.01 | 537.00 | 0.01 |
| TELEPHONE EXPENSE | 4,711.64 | 0.52 | 46,871.14 | 0.45 |
| TRAVEL EXPENSE | 0.00 | 0.00 | 1,631.58 | 0.02 |
| SALARIES OF WAGES EXPENSE | 733,741.08 | 81.08 | 6,664,831.66 | 63.58 |
| UTILITIES EXPENSE | 2,089.49 | 0.23 | 26,738.06 | 0.26 |
| TOTAL EXPENSES | 1,072,882.76 | 118.56 | 9,965,453.52 | 95.06 |
| NET INCOME | (167,962.78) | (18.56) | 517,958.63 | 4.94 |

**CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER**

I HEREBY CERTIFY that I have examined the balance sheet and income statement prepared by Luiza Roitshtein, and that to the best of my knowledge and belief, it is true, correct, and complete statement from the books and records of the provider.

_[signature]_     ADMINISTRATOR     10/5/7
Signed: Officer and Administrator     Title     Date

## CERTIFICATE OF SERVICE

Frank A. Labor III, an Assistant United States Attorney, certifies that a copy of the Government's Response to the Defendant's Supplemental Brief in Support of Defendant's Motion for a Judgment of Acquittal was served on defense counsel Lynanne B. Wescott by ECF on April 25, 2016.

/s/ Frank A. Labor III
FRANK A. LABOR III
Assistant United States Attorney
